**Davis Miles McGuire Gardner**
80 E. Rio Salado Pkwy., Ste. 401
Tempe, AZ 85281
Telephone: (480) 733-6800
Fax: (480) 733-3748
efile.dockets@davismiles.com
Joshua W. Carden, State Bar No. 021698
Attorney for Plaintiff Joyce L. Newman

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joyce L. Newman,<br><br>  Plaintiff,<br><br>vs.<br><br>Tucson Unified School District,<br><br>  Defendant. | CASE NO. _____<br><br>**ORIGINAL COMPLAINT**<br>**JURY TRIAL REQUESTED** |

Plaintiff Joyce L. Newman, by and through undersigned counsel, seeks relief in this Original Complaint against Defendant Tucson Unified School District ("TUSD") as follows:

**INTRODUCTION**

1. This case involves the outrageous treatment of a School Safety Officer at the hands of her school district superiors. During her tenure, the Plaintiff experienced significant gender-based and disability-based harassment and discrimination, and open retaliation for opposing that treatment directly and through the EEOC, and retaliation for exercising her rights under the Family Medical Leave Act – up to and including her interrogation during the week of March 24, 2014.

## THE PARTIES

2. Plaintiff Joyce L. Newman is a married woman and a resident of Cochise County, Arizona, and, at all relevant times in this Complaint, an "employee" of Tucson Unified School District at all times material to this action.

3. TUSD is a political subdivision of the state of Arizona, doing business in Pima County, Arizona with a local address of 1010 East 10th Street, Tucson AZ 85719. All acts alleged in this Complaint occurred in Pima County, Arizona.

4. According to its policies, Defendant may be served by serving its Director of Staff Services, Mary Alice Wallace on behalf of the TUSD Governing Board at the above-listed address.

5. Defendant is the largest school district in Tucson, Arizona, and was an employer of Plaintiff within the meaning of 42 U.S.C. § 2000e, *et seq*, 29 U.S.C. § 2611, *et. seq.*, and 42 U.S.C. § 12111(5)(A), at all times material to this action.

6. Defendant, at all times material hereto, upon information and belief employed over 3,700 persons.

## JURISDICTION AND VENUE

7. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e, *et seq.*, 29 U.S.C. §2611, *et. seq.*, 42 U.S.C. §12111, *et. seq.*, and 28 U.S.C. §1331.

8. The unlawful employment practices described herein were committed within the State of Arizona, on Defendant's premises located in Pima County, State of Arizona.

9. Accordingly, venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

## ALLEGATIONS COMMON TO ALL CLAIMS

10. On or about January 1, 2007, Defendant TUSD hired Plaintiff as a School Safety Officer.

11. She had previously worked since August 2006 for TUSD as a Campus Monitor.

12. Plaintiff suffers from a disability, namely, chronic migraines.

2

13. Plaintiff's disability impairs her in major life functions, in that Plaintiff was often unable to care for herself, often remaining in bed and having her husband tend to her, often having difficulty concentrating, thinking straight, and making decisions. The disability often made Plaintiff nauseated to the point where she could not get out of bed.

14. Plaintiff applied for and received intermittent FMLA leave on or about January 2009, January 2011 and January 2013. Plaintiff applied for ADA disabled status in February 2014.

15. Plaintiff is a member of the Tucson chapter of the American Federation of State, County, and Municipal Employees (AFSCME) union.

16. In 2010, one of Plaintiff's supervisors David Vildusea, began harassing Plaintiff about her FMLA leave, including docking her pay.

17. Plaintiff reported this to her union representative, and, upon information and belief, the Tucson AFSCME chapter notified Shannon Roberts of TUSD Human Resources that David Vildusea was violating Plaintiff's rights under the FMLA and violating the union's memorandum of understanding with TUSD on or about June 24, 2010.

18. In November 2010, Plaintiff volunteered for a shift change that was supposed to last three months.

19. Once the three months ended, Plaintiff frequently requested reassignment to her original shift, but was denied.

20. Newer offices (male officers) were given the shifts Plaintiff requested, despite the Defendant's policy and practice of making assignments based on seniority for other officers.

21. This practice has continued, with the most recent assignment of new officers to the shifts Plaintiff sought occurring in June 2013.

22. In 2011, David Vildusea instituted new requirements unique to Plaintiff when she found it necessary to call off work using her 2011 FMLA benefits.

23. He requested that Plaintiff not contact the school safety dispatch (her previous routine), and that Plaintiff just inform him directly.

3

24. This requirement created problems with Plaintiff's shift, because Vildusea would fail to notify anyone else that Plaintiff was going to be absent.

25. Plaintiff would end up receiving calls all during the night wanting to know if Plaintiff was going to work.

26. Upon information and belief, Vildusea did this because Plaintiff had reported him to the union, and the union to TUSD.

27. At or around November 1, 2011, Vildusea again changed the way Plaintiff could use FMLA, after several complaints that dispatch was not being informed whether Plaintiff was going into work or not.

28. Vildusea now required Plaintiff to call both Vildusea and school safety dispatch.

29. On January 4, 2012, after taking some FMLA leave, Plaintiff sent an email to Vildusea requesting to return back to work.

30. Upon information and belief, Vildusea spoke with Sgt. Jon Stewart and learned that "middle shift" was missing a dispatcher.

31. Vidusea responded that Plaintiff could return to work, but with a new schedule as a dispatcher and unusually varied hours.

32. Plaintiff's doctor did not release her to the shift that Vildusea proposed.

33. Upon information and belief, Vildusea created the shift with purposefully strange hours in the hopes that Plaintiff would not return back to work.

34. On or about January 6, 2012, Plaintiff informed Lynn Miller in Human Resources that her release date from the doctor was February 15, 2012.

35. Vildusea informed Plaintiff shortly thereafter that she would still be working the same shift.

36. Plaintiff received a call from Norma Cota who submits timesheets to Payroll on February 9, 2012, stating that she needed to ask for an extended leave.

37. Plaintiff immediately emailed Lynn Miller in Human Resources to communicate regarding the situation.

4

38. Ms. Miller informed Plaintiff that Director of School Safety Jeff Coleman had agreed to let Plaintiff have leave without pay from February 6-14, 2012.

39. Coleman later attempted to renege on this agreement and sought termination of Plaintiff for "job abandonment."

40. After several conversations among Plaintiff and Human Resources, Mr. Coleman finally re-approved the leave.

41. Plaintiff met with Coleman on June 21, 2012 to again discuss getting her original shift back after over two years of being on her "three month" shift change.

42. On July 1, 2012, Defendant hired Sergeant Kevin Kingsley, who became one of Plaintiff's superiors.

43. Kingsley was the chief instigator of the sexual harassment of Plaintiff, which escalated to the point of unwanted touching despite Plaintiff's frequent complaints.

44. On July 27, 2012, Plaintiff sent a follow-up letter to Coleman on her request of changing her shift back.

45. On approximately July 30, 2012, David Vildusea denied Plaintiff's request.

46. Plaintiff also received an email on July 31, 2012 from Coleman denying Plaintiff's request for shift change.

47. About August 2, 2012, Plaintiff notified Robert Slabaugh, President of AFSCME for TUSD, of the situation regarding Plaintiff's schedule changes without regard for her seniority and Plaintiff filed a formal grievance.

48. Later, on October 10, 2012, Plaintiff received an email from Coleman announcing a new bidding system for obtaining shifts.

49. Sometime in October, Sgt. Kingsley informed Plaintiff that if she kept angering the command staff, Plaintiff was going to lose her job and other officers would no longer provide her back-up when she needed it in the field.

50. On November 13, 2012 Plaintiff sent an email to David Vildusea asking when the new schedule would take place.

51.  Sgt. Kingsley informed Plaintiff that Vildusea and Coleman were tired of Plaintiff pushing the request for the schedule change.

52.  David replied by email stating the schedule would change on the 18th of November.

53.  In December, Sgt. Kingsley and David Vildusea allowed two male Officers to change their schedules without following the proper bid procedures under the new system.

54.  Plaintiff complained to Coleman about the harassment issues she was having with Sgt. Kingsley, as well as his threat to abandon her in the field.

55.  Coleman ignored the complaint and instead lauded Kingsley's "loyalty."

56.  In January 2013, Sgt. Kingsley informed Plaintiff that he had to retake the anti-discrimination Training and that he wanted Plaintiff in the same training with him.

57.  On January 23, 2013, Plaintiff received an email from Jeff Coleman stating she needed to take the Anti-discrimination training and it was to take place Jan. 30, 2013 at 1:00pm -2:00 pm.

58.  On January 25, 2013, Plaintiff was approved again for intermittent FMLA.

59.  After the Anti-discrimination training on January 30, 2013, Plaintiff was leaving to go eat before her shift.

60.  Sgt. Kingsley demanded that Plaintiff go to the main office and request a meeting with Marcia McCaskill (with whom Plaintiff had no appointment) "to take care of business," referring to her ADA disability status application.

61.  Plaintiff informed Kingsley that she did not have an appointment for such a meeting.

62.  Kingsley stated that he "owned" Plaintiff and that she was to do whatever he asked.

63.  Plaintiff responded that he didn't own her and he would have to earn his stripes before he could tell her anything.

64.  After Plaintiff made those, comments Jeff Coleman instructed Plaintiff to go upstairs and wait to discuss the issue.

6

65. Plaintiff followed the direction and went upstairs and sat in a chair outside Jeff Coleman's office while Coleman and Vildusea discussed the matter.

66. Plaintiff was then told to go and sit inside of Vildusea's office and did so for approximately three and a half hours.

67. During this time, Plaintiff requested to go to the rest room and was followed by Vildusea, who waited outside the bathroom until Plaintiff came back out and then escorted her back to the chair.

68. Plaintiff called her Union Representative during this time and when she began to talk with him, Vildusea stood there. She asked for privacy on the call and walked outside, but Vildusea remained within ear-shot of her conversation.

69. This experience was extremely humiliating for Plaintiff and was not inflicted upon any other officer, including Sgt. Kingsley.

70. Ultimately, Defendant placed Plaintiff on administrative leave.

71. Plaintiff was asked to return back to work after 10 days of paid leave to receive a Written Reprimand 1 for Staff Conduct.

72. In contrast, Sgt. Kingsley was merely spoken to for his comments and received no formal reprimand.

73. In February 2013, Sgt. Kingsley informed Plaintiff that she should have stayed on her old (undesirable) shift because all Plaintiff has done since is anger the command staff.

74. Sometime in early 2013, Plaintiff asked Sgt. Kingsley if they were allowed to wash their patrol cars in the parking lot on the weekend. He responded only if Plaintiff wore "Daisy Duke" shorts. Plaintiff also asked why she could not attend or work the Board meetings anymore and Sgt. Kingsley replied, "because we have to dress down, so if you want to work the Board you would have to wear a mini skirt."

75. In early April, 2013, Sgt. Kingsley's sexual harassment increased to unwanted touching.

7

76. On May 23, 2013, Jeff Coleman received an email from TUSD Legal with several School Safety employee names that had to meet with Ben Hufford, an attorney hired by TUSD to do outside investigations on school safety.

77. In May, Plaintiff and other employees also met with TUSD President A. Grijalva, to discuss all the issue with School Safety and the harassment. Ms. Grijalva said she was going to meet with John Pedicone, former school Superintendent, and request an investigation.

78. On June 5, 2013, Coleman requested Norma Cota to contact Lynn Miller to make sure Plaintiff was using her FMLA right and using Plaintiff's time when calling out.

79. On or about June 9, 2013, a Level 3 grievance was filed Union Representative Matt Cline on behalf of Plaintiff for violations of Plaintiff's FMLA, ADA, and retaliation.

80. Plaintiff and a female co-worker simultaneously filed a sexual harassment against Kevin Kingsley with Marcia McCaskill on June 11, 2013 via a meeting. Union representative Matt Cline was at that meeting.

81. Plaintiff met with Ben Hufford in reference to School Safety in June.

82. On June 11, 2013, Plaintiff met with Marcia McCaskill regarding Plaintiff's qualifying for ADA disability status and the sexual harassment Plaintiff was experiencing from Sgt. Kingsley.

83. Another meeting was held on June 13, 2013, with Jeff Coleman, Marcia McCaskill and Union Rep Steven Hopper regarding Plaintiff's ADA disability status.

84. After the meeting, Marcia McCaskill advised Plaintiff that McCaskill would talk to her boss about the fact that Sgt. Kingsley had not stopped his unwanted touching.

85. Plaintiff learned later that Sgt. Kingley was placed on administrative leave from the dispatcher.

86. June 18, 2013, Jeff Coleman sent out email to all employees at School Safety incorporating all of Plaintiff's allowable ADA accommodations as discussed (such as turning the portable radio off for some quiet break time or to take lunch to help her with her disability) to provide simultaneously all employees the identical accommodations.

8

87. In June 2013, Plaintiff had another meeting with Ben Hufford. At that time they continued to discuss the violations with school safety and command staff.

88. On July 3, 2013, Plaintiff received a letter from Marcia McCaskill substantiating findings regarding Sgt. Kingsley's sexual harassment, hostile work environment, and battery of Plaintiff.

89. On August 1, 2013 after Coleman's email, Vildusea sent a contradictory email stating, that after researching it, everyone must comply with their union manual requirements and not Coleman's recommendation.

90. On August 19, 2013, Plaintiff received a letter from Pamela Palmo (who) in reference to the Sexual Harassment findings on Sgt. Kingsley and that Marcia McCaskill was incorrect.

91. On August 23, 2013, Defendant assigned Plaintiff a different patrol vehicle – one that was filthy and smelled bad.

92. When she asked to have it cleaned, Defendant informed her that she would have to do so at her own expenses.

93. Defendant began taking away Plaintiff's opportunity to work overtime on approximately August 28, 2013.

94. That overtime was reassigned to Kevin Acorn.

95. On August 29, 2013, Plaintiff called off work because when she was going to work, she stopped and assisted in helping with a car accident.

96. Plaintiff received an email on August 30, 2013 from Jeff Coleman about representing School Safety at the car accident.

97. Plaintiff, and the entire department, received another email on September 6, 2013 from Jeff Coleman stating that Sgt. Kingsley voluntarily resigned from TUSD.

98. On that date, fellow employee Kevin Acorn started making comments to Plaintiff calling her and other female officers "b****es" and worse.

99. Upon information and belief, Acorn was angry because Sgt. Kingsley had resigned in the context of the sexual harassment complaint.

100. Plaintiff emailed Sgt. Stewart to complain about Kevin Acorn's language on September 10, 2013.

101. Upon information and belief, Sgt. Stewart passed her complaint to senior officers to stop the comments.

102. In response, the entire unit received an email from Sgt. Stewart on September 11, 2013 to following the Governing Board procedures on use of language or comments.

103. Upon information and belief, Kevin Acorn was never disciplined for making the inappropriate comments.

104. On September 12, 2013, Plaintiff received a Commendation for assisting with the car accident on Aug. 29, 2013. Jeff Coleman tossed it at Plaintiff and then began asking her about Kevin Acorn's comments.

105. Plaintiff refused and told him if she needs to file a complaint, she would go to Marcia McCaskill as before.

106. On September 13, Defendant denied Plaintiff's request to become a field training officer, despite the recommendation of her immediate supervisor for the position.

107. Upon information, this was more retaliation for Plaintiff's engaging in protected activity.

108. Sometime in 2013, David Vildusea approached Lynn Miller and asked about Plaintiff's FMLA.

109. Plaintiff was informed by Lynn Miller that Jeff Coleman was trying to find a reason to fire her and Sgt. Stewart.

110. On September 13, 2013, Plaintiff arrived at work and while she was getting ready to leave the office, Plaintiff got sick.

111. Two co-workers told her to sit in their office until she felt better. David Vildusea came to their office. He requested Plaintiff go into the field, which Plaintiff did.

112. After leaving, David attempted to have one of the co-coworkers write a statement stating Plaintiff was interfering with his work – that co-worker refused to lie.

10

113. On October 1, 2013, Plaintiff received a Letter of Reprimand 2 for staying in the Officer longer than 15 minutes.

114. On October 4, 2013, Plaintiff received an email from Jeff Coleman wanting to know if she was going to take a Governing Board (unpaid) leave, because he had intercepted Plaintiff's note from her husband's doctor about her husband's cancer and the need for Plaintiff to use her FMLA to be with her husband for his treatment.

115. It was later found that Jeff Coleman was not allowed by Defendant's policies to have intercepted the note.

116. Next, Coleman and Vildusea began accusing Plaintiff falsely of having an affair with Sgt. Stewart.

117. On October 7, 2013, Plaintiff called TUSD's President, A. Grijalva, to inform her that Coleman and Vildusea were falsely accusing Plaintiff of having an affair with Sgt. Stewart.

118. Grijalva told Plaintiff "it might be time to file a lawsuit" or words to that effect.

119. Plaintiff filed a charge of discrimination with the EEOC on October 13, 2013. A true and correct copy of the charge is attached hereto as Exhibit A.

120. About October 17, 2013, Matt Cline emailed David Vildusea letting him know that the policy of giving school safety officers' (AFSCME members) over time to school safety supervisors (CWA) was in violation of the Defendant's agreement.

121. On October 22, 2013, Plaintiff received a letter from Marcia McCaskill formally approving her for the ADA accommodation.

122. On November 6, 2013, Plaintiff received an email from Joseph Murrieta (an aide to Shannon Roberts in HR) setting a meeting for a Level 3 Grievance on November 26, to address the Reprimand 2 (15 minute rule violation to be out on assignment within 15 minutes of shift).

123. November 26, 2013, at the Level 3 Grievance meeting, with Jeff Coleman, Plaintiff, Shannon Roberts, and union representative Matt Cline, Mr. Roberts' ruling on the

11

Reprimand 2 penalizing Plaintiff with a 2-year service record notation (a form of probation) was changed by him to a 1-year record notation if Plaintiff did not receive any more reprimands

124.   Despite the finding, Plaintiff received an additional Letter of Direction on January 30, 2014 at the instigation of Coleman and Vildusea.

125.   Upon information and belief, the new Letter was additional retaliation for Plaintiff continuing to engage in protected activities, including filing a charge of discrimination with the EEOC.

126.   In January of 2014, Lynn Miller was directed not to speak to Plaintiff and she had to turn Plaintiff's medical files over to legal.

127.   On February 13, 2014, Sgt. Batory informed Plaintiff that no matter how many commendations or award Plaintiff has received, the "1 OMG killed them all" – meaning that no matter how much Plaintiff did well, the command staff (Coleman, Vildusea, etc.) are going to find something bad to focus on.

128.   In February 2014, Plaintiff was the first to be asked to attend Trauma Training by Sgt. Batory.

129.   However, after Sgt. Batory advised David Vildusea that Plaintiff was attending, her name was removed from the Trauma Training.

130.   During February 2014, Plaintiff was asked if she was the "Special One" by new Sgt. Rafford.

131.   Upon information and belief, this question came about because Defendant, through its supervisory employees, was retaliating against Plaintiff by sharing her medical issues and harassment and retaliation complaints with other employees.

132.   The week of March 24, 2014, Plaintiff learned from the union that her employment would being terminated.

133.   Upon information and belief, Plaintiff experienced discrimination because of her gender, her disability, her exercise of her FMLA rights, and in retaliation for her charge filed with the EEOC and her exercise of her FMLA rights.

134. The Equal Employment Opportunity Commission issued Plaintiff a notice of her right to sue which is attached hereto as Exhibit B.

135. Plaintiff timely filed this lawsuit after receiving her notice of right to sue.

136. At all times pertinent to this Complaint, the employees of TUSD were acting within the course and scope of their employment with TUSD; and as a result thereof, TUSD is responsible and liable for the acts and omissions of those employees, as alleged herein, under the principles of *respondeat superior*, agency and/or other applicable law.

137. All conditions precedent necessary to the filing of this lawsuit have been performed or have occurred.

## COUNT ONE – FMLA VIOLATION AND RETALIATION

138. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

139. Defendant is an employer obligated to conform to the FMLA.

140. Plaintiff was a covered employee under the FMLA.

141. Plaintiff was forced during her employment to take intermittent medical leave attendant to her medical issues and pursuant to her rights under the FMLA.

142. Defendant, through its supervisory employees, violated the FMLA by acting unreasonably in its communications with Plaintiff about her leave, refusal to acknowledge the legitimacy of her leave, and general harassment of Plaintiff in taking her leave.

143. Defendant punished Plaintiff because of the exercise of her rights under the FMLA.

144. Defendant has also retaliated against Plaintiff based on her assertion of rights under the FMLA by materially changing the terms of her employment and/or has engaged in the unlawful interference with FMLA rights by using Plaintiff's medical leave as a negative factor in the decision to negatively impact Plaintiff's employment conditions, and ultimately to discharge Plaintiff.

145. As a direct and proximate result of Defendant's wilful conduct, Plaintiff has sustained damages in the form of lost wages and value of benefits. Plaintiff continues to lose the value of such wages and benefits into the future.

146. As a direct and proximate result of Defendant's wilful conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

147. Defendant's conduct was malicious, done with reckless indifference, and/or performed with an evil mind so as to entitle Plaintiff to punitive or exemplary damages.

## COUNT TWO – ADA VIOLATION AND RETALITION

148. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

149. Plaintiff's symptoms and physical condition, as described above, caused substantial impairment to the performance of major life activities, and/or the perception by Defendant that Plaintiff experienced substantial impairment of major life activities.

150. Plaintiff made a request upon Defendant to reasonably accommodate her disability.

151. Defendant failed to engage in the interactive process required by the ADA to pursue a reasonable accommodation.

152. Defendant materially affected the conditions of Plaintiff's employment due to her disability and her requests for an accommodation in violation of the ADA and treated Plaintiff disparately compared to other similarly-situated non-disabled employees because of her disability and her requests for accommodation.

153. Further, Defendant retaliated against Plaintiff because her disability and her engaging in the protected activity of exercising her right to request and utilize a reasonable accommodation under the ADA

154. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of lost wages and value of benefits. Plaintiff continues to lose the value of such wages and benefits into the future.

155. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

156. Defendant's conduct was malicious, done with reckless indifference, and/or performed with an evil mind so as to entitle Plaintiff to punitive or exemplary damages.

### COUNT THREE – TITLE VII VIOLATION AND RETALIATION

157. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

158. Defendant is an employer within the meaning of 42 U.S.C. § 2000e(a).

159. Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender (female) in violation of Title VII.

160. Defendant's acts of discrimination in this regard were unlawful and intentional.

161. Because of the foregoing actions as alleged in this Complaint, Plaintiff was subjected to gender discrimination and sexual harassment to an extraordinary degree, creating an abusive and hostile work environment.

162. The person or persons who engaged in gender discrimination and harassment were employees and/or agents of Defendant with immediate and ultimate authority over Plaintiff.

163. Plaintiff made reasonable efforts to avoid the harassment and to report the harassment according to Defendant's protocols and the chain of command.

164. The harassment was so extreme as to shock the conscience and support an award of punitive damages.

165. Additionally, Plaintiff participated in a protected activity – namely repeated protests of the gender discrimination and harassment to Defendant's supervisory personnel.

166. Defendant retaliated against Plaintiff by and through its employees after Plaintiff complained of discrimination in the workplace – in violation of Title VII.

167. Specifically, Defendant's employees restricted her assignments, issued wanton disciplinary action for events and actions that no other officers received discipline for, and materially affected the conditions of her employment while she was out on leave.

168. Plaintiff has suffered and will continue to suffer irreparable injury and monetary damages as a result of Defendant's retaliatory action unless and until this Court grants relief.

169. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of lost wages and value of benefits. Plaintiff continues to lose the value of such wages and benefits into the future.

170. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

171. Defendant's conduct was malicious, done with reckless indifference, and/or performed with an evil mind so as to entitle Plaintiff to punitive or exemplary damages.

**JURY TRIAL DEMANDED**

172. Plaintiff demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

1. Declaring that the acts and practices complained of herein are in violation of state and/or federal law;

2. Issuing equitable relief directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment or employment opportunities;

3. Issuing equitable relief directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's discriminatory treatment of her, and make her whole for all earnings she would have received but for Defendant's discriminatory treatment, including, but not limited to, time of service, back pay, front pay, pension, and other lost benefits;

4. Awarding Plaintiff compensatory and punitive damages in an amount to be determined by the jury.

5.     Awarding Plaintiff pre- and post-judgment interest, the costs of this action, and reasonable attorneys' fees as provided by the statutes providing the causes of action cited herein.

6.     Granting such other and further relief as this Court deems necessary and proper.

RESPECTFULLY SUBMITTED this 28th day of March, 2014.

**DAVIS MILES MCGUIRE GARDNER, PLLC**

By /s/ Joshua W. Carden
Joshua W. Carden
80 E. Rio Salado Pkwy., St. 401
Tempe, AZ  85281
*Attorneys for Plaintiff*